Case No. 25-5144, Batsy Witteswar, et al. v. Gary Lake, in her official capacity as Senior Advisor to the Acting CEO of the U.S. Agency for Global Media, et al., at Balance. Case No. 25-5145, Michael Abramowitz, in his official capacity as Director of Voice of America, et al. v. Gary Lake, in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media, et al., at Balance. And Case No. 25-5150, Middle East Broadcasting Networks, maybe, v. United States of America, et al., at Balance. And Case No. 25-5151, Radio Free Asia v. United States of America, et al., at Balance. Personnel issues. We need that for the accountants. We need Yomas for the appellees. Mr. Schultz for the appellees. Ms. Stout, good morning. Good morning, and may it please the Court. My name is Abigail Stout, and I represent appellants in this case, and will be addressing the employment and personnel issues. This case is about two fundamental flaws, lack of jurisdiction and lack of a cause of action. Hopefully, this Court has passed on these very issues just last month in National Treasury Employees Union v. Vote, which squarely controls here. In National Treasury, in response to plaintiff's allegations that the Consumer Financial Protection Bureau was allegedly shutting down, this Court held that the District Court lacked jurisdiction to hear plaintiff's claims predicated on loss of employment, and the plaintiff's claims did not target final agency action under the Administrative Procedure Act. The same logic and rationale apply here. I'd like to focus on two points today. First, that the District Court erred by ordering reinstatement of the agency's employees and contractors because the District Court lacked jurisdiction over the agency's personnel actions. And second, that plaintiff's claim is not cognizable because plaintiffs identified no final agency action. Do you think all plaintiffs are subject to some form of channeling under the first part of NTEU, so that we don't reach the cause of action question, or not? I mean, some cases for channeling are much stronger than others. I wonder if you think that decides the whole case. So it is our position that by either addressing the channeling or the cause of action under the APA, both would be dispositive of the claims here. With respect to the plaintiff's claims and which ones are channeled, we have several sets and several types of plaintiffs at issue here. So we have the... I thought the weakest ones for channeling, I thought, were the RSF entities, and maybe the TNG, the union that represents the employees of the grantees. Do you think those are channeled? Two responses to that. First, with regard to the CSRA, the Supreme Court has been clear that it is a comprehensive and also exclusive scheme, meaning CSRA has laid out which remedies are available to which plaintiffs and which are not. So it would be an end-run around the CSRA to allow plaintiffs like organizational plaintiffs who do not have employees with direct harm to then... Sure, for a union, but I thought they might be more claiming standing as listeners, which is something we permit in our FCC cases, for instance. And if there's a listener standing claim in here, I mean, that wouldn't be subject to CSRA channeling, would it? So to the extent that they are challenging individual employees' adverse employment actions, for example, employees being laid off or put on administrative leave, then we would argue that those types of claims are channeled to the CSRA. And to the extent that those organizational plaintiffs are not able to bring claims under there, then the scheme would preclude it. But to the extent that those organizations have more of the listener standing and are challenging the alleged decrease in broadcasting, for example, then that would be an APA action, and they would have to target final discrete agency action and proceed under the APA there. But here the district court, in its injunction, had a mismatch. He ordered employment-related remedies while the alleged harms related to the APA and the alleged claim and the alleged dismantling of the agency. But how is it a mismatch if there are, let's say, 1,147 full-time employees, which was what the Thomas Declaration, I believe, said, and all but about 100 of those employees were placed on administrative leave? The argument is that those 100 people can't fulfill the statutory mandate, and so that is either arbitrary and capricious because it doesn't comply with the executive order or arbitrary and capricious because it violates the statute that requires, that mandates certain activity being performed by the agency. Either way, the way that you remedy that is by telling the people to go back to work. So where is the mismatch? So we would respectfully push back on that last bit about telling people to go back to work. We do not dispute that the APA may allow courts to enter orders, for example, to do a certain something, a certain thing that the agency, by statute, is required to do, and if plaintiffs withstanding then challenge an agency action that would violate that statute, then they could address it that way. Our main complaint here is that the district court went one step further. In addition to, under prong three of the injunction, in ordering that VOA restore broadcasting consistent with the injunction or consistent with the statute, it went a step further and then ordered that all USAGM employees and contractors be reinstated. It's that extra step that we say the district court was not permitted to do here. So prong three of the injunction does... I don't understand the argument that they're not permitted, that the district court wasn't permitted to do it. You might argue that the district court shouldn't have told all the employees, shouldn't have mandated that all of them go back, only some subset of them or something, if there was some record to support that. But where does it follow that the district court basically had no power or no authority to order the reinstatement? So we would point to specifically Norton v. Southern Utah Wilderness Alliance in response to your Honor's question. There the court was very clear to explain that although a district court under the APA may order an agency to take a certain action, it can't, and this is a direct quote, the court can compel the agency to act but has no power to specify what the action must be. And the court provided very good rationale for that. Doing so, requiring that certain employees are required for specific statutory functions or requiring that by name or by number certain employees are required, the agencies required to use them would impermissibly put courts in... I'm not sure I understand your reading of Norton. I mean, the whole point of the APA is to set aside unlawful agency action. If that's all that the district court is doing by saying that the agency action here, placing all of these employees on administrative leave was unlawful, so I'm setting aside, how does that have anything to do with this rule you're articulating from Norton? I think there are a couple responses to that. First, that we do not dispute that a court has the ability to set aside final agency action, but then secondly, the district court didn't analyze the employment disputes as a final agency action. And to the extent that it did, those would be and should be channeled under the CSRA. So to the first point, the district court, when analyzing what happened in this order, identified a, quote, slew of actions that the agency took and then analyzed all of those actions in a lump sum and wholesale approach, just like Lujan cautioned that courts should not do. And I think we're mixing apples and oranges here. You're challenging an injunction. The injunction set aside an action which was placing people on administrative leave. The district court might have said a lot of things about a lot of different actions, but ultimately that injunction sets aside that one specific action. So tell me why that action wasn't final agency action. To the extent that this court construed that action of the agency setting, putting all the employees on administrative leave, then we would argue that that was improper because those claims should be channeled. So you're conceding that that was final agency action if we look at it that way? Your Honor, we would encourage the court to the extent it's helpful to kind of look at it as a decision tree. To the extent the court sees the decision to make certain personnel actions, then those should be channeled to the CSRA. So no, is it final agency action to place employees on administrative leave? We have not briefed for that issue, but we are not—we don't protest that at this point, that that would be a final agency action. Our argument is that it is not reviewable under the APA because decisions related to employment and adverse—especially adverse employment decisions are and should be channeled to the CSRA. So, okay. Let's talk about channeling. To the extent that the CSRA provides a remedy for the particular personnel action that is at issue, is the analysis any different about kind of whether the district court has precluded from having jurisdiction than if the CSRA did not provide a remedy? I'm trying to understand whether anything—whether we have to identify specifically for each personnel action whether there was a remedy within the CSRA or not. Or does that matter? We still do essentially the kind of Thunder Basin block analysis, whichever way that cuts. It's our position that you would do the Thunder Basin analysis whichever way that cuts. And National Treasury is extremely instructive on that point. They're very similar to here. The CFPB has taken a large volume of employment-related actions. In the National Treasury, this court went through each of the three Thunder Basin factors and point by point discussed why those claims should be channeled. So, for example, in the first point, that the finding and conclusion would not foreclose meaningful judicial review, there it said that if injuries arise from adverse employment actions, the MSPB and the SLRA may remedy those injuries by reinstatement and back pay, which are exactly the remedies that the employees here would be seeking. So not only would they be able to get those remedies under the appropriate administrative scheme, they would then have the ability to, on appeal, have review by a federal court as well. Then on the not wholly collateral point, National Treasury explains that seeking to reverse removal decisions or decisions regarding any kind of adverse employment or personnel action is precisely the type of challenge that the CSRA contemplated. It is the heartland of the CSRA. And then finally, about expertise. Here, if the remedy is reinstatement and the remedy is related to employment-related actions, then that again is the heartland of CSRA coverage. This analysis doesn't change to Your Honor's point. To the extent that the claim is that this agency is mandated to fulfill certain obligations and wholesale placement of over 90 percent of its staff on administrative leave basically prevents it from fulfilling its statutory mission, how is that the kind of claim that either the special counsel or the MSPB has any special expertise resolving that sort of a dispute? Here we would rely on National Treasury. We would also point to Elgin. There, the court in Elgin was clear that just because a constitutional or statutory claim is implicated, indeed there the plaintiff said that the adverse employment action taken against him was because the agency was violating the statute and it was unconstitutional. Very similarly here, to the extent any personnel claims are based on the agency not complying with the statute or any kind of constitutional claims, those would not preclude review under the CSRA based on Elgin's reasoning and then based on National Treasury's reasoning. So National Treasury also talked about the fact that there are claims challenging kind of wholesale agency actions that could be reviewable under the APA. And there's someone here who knows a little bit about what National Treasury says, but it points out that to the extent that there is an agency action that could be deemed final agency action that purports to terminate an agency program, that that could be reviewable under the APA, notwithstanding the comprehensive statutory scheme, right? So I want to pull apart a few portions there. First, to the extent that there is a wholesale programmatic challenge being alleged, we would say that that is not reviewable agency action. To the extent that there is a reference to the comprehensive review scheme and it would implicate employment-related disputes or employment-related actions, then we would say that's channeled to the CSRA. But to the extent that a plaintiff is coming in and saying, I've been harmed because of an agency program that has been terminated and there is a final agency action to terminate that program, then we would say that that could be a cognizable claim under the APA. But that's simply not what happened here. Here, whether it be the—here plaintiffs challenge explicitly that the agency action was the alleged wholesale dismantling of USAGM Invoice of America. And that runs into several problems under the final agency action test that the Supreme Court has said is required for APA review. First, there's a discreteness problem. Under the agency—or under the district court's own order, rather than analyzing a single policy, it analyzed a bunch, a slew of agency actions. So there's a discreteness problem there. Well, the district court did look at a slew of actions because the plaintiffs asked them to look at a slew of actions. But ultimately, the core, the nub of the district court's preliminary injunction was the administrative leave. And the Thomas Declaration says what's obvious, which is that, you know, on one day, there's an executive order. And then the next day, pursuant to that executive order, we placed everyone on leave. That was essentially one agency action. So why shouldn't we look at that as a discrete agency action, placement of those employees on leave? Well, first, I don't even take plaintiffs to be alleging that a decision to place a large amount of employees on administrative leave is the agency action that they're challenging. Instead, they're challenging something even broader than that, the alleged dismantling of USAGM and Voice of America. Well, they're saying that the dismantling is happening. The agency announced that it's dismantling it. There's, you know, lots of statements to that effect. And then the methodology by which they're dismantling it, there's several different actions, but one of them is placing almost everybody on administrative leave. So if we just zero in on that as the action, why isn't that a discrete final agency action? Well, in addition to plaintiffs not even challenging that as a discrete final agency action, I would also say that trying to analyze a volume of employment-related decisions doesn't get out of the CSRA issue. So just because there are a lot of employment-related decisions being made, that doesn't mean that CSRA channeling is all of a sudden precluded. And that would actually put the court in a very tricky position if that was the test, because then the question would be how many employment-related decisions would rise to the level of then becoming an action reviewable under the APA, which not only runs contrary to APA law, but would also just be a pragmatic issue and hard to administer for the court. I'm trying to understand you, Arden. You're saying that if the employment actions have the effect of shutting down an agency, channeling through the CSRA makes them unreviewable, even if they have that effect. Is that your argument? So our argument is that those employment-related decisions would be unreviewable because of the CSRA. But our argument is not that all actions, basically the harm that plaintiffs are getting at is this alleged dismantling of USAGM and Voice of America. And our position is not that they could never challenge anything that the agency has done over the past few months. Our argument is that they are required to follow the APA procedure and challenge final agency action. And that can't be just this broad decision or broad alleged policy of dismantling the agency. You want to characterize it as that. But, I mean, we review records and we review what the district court said. And I'm looking at the district court's memorandum opinion. And, I mean, page one of the memorandum opinion, the district court says that the plaintiffs allege that the agency's actions purportedly in furtherance of the executive order terminating and threatening to terminate the majority of staff, ending grants, et cetera, et cetera, violate all of these different constitutional principles and acts. And throughout the opinion, the district court is making it clear that, yes, there's lots of different things that the plaintiffs are saying are threatening the agency, but first and foremost, it's about placing everyone on leave. And, indeed, that is prong one of the injunction. And it doesn't deal with all of these other things that are complained about, the grants and other things. It's about placing these people back in the position they were before the executive order. So you've got to deal with that. And I don't understand your argument because there was a lot of wasted ink in national treasuries be bought talking about, well, what if this was a shutdown, if that were irrelevant because channeling precludes the cause of action completely under the APA. And then why did the court spend all that time talking about why this wasn't that sort of an action? Help me understand that. So I think to the extent your Honor's concerns relate to the ability for plaintiffs who are harmed to redress their harm, I want to say that our argument is not that all of the plaintiffs here are without a forum to address their harm. The individual employees have a forum in the CSRA to address their personnel decisions. To the extent that plaintiffs are concerned about the agency stopping certain agency programs, stopping certain broadcasting, stopping certain obligations that it has under statutes, plaintiffs have the ability to challenge those things. But based on the APA review and the specific way that Congress crafted it to require agency action, which is a very defined term, a term of art, not everything that the agency does, and the Supreme Court's interpretation of that term, agency action, to reject, it would be a challenge to programmatic challenges, as Lujan and Suha make very clear. The plaintiffs simply didn't do this in the way that they were supposed to. Is placing someone on administrative leave a final agency action? If the court construes it as a final agency action, then we would say that that individual personnel decision should be channeled to the CSRA. Is it a final agency action, yes or no? We haven't briefed that particular issue, but we do not-we don't protest at this point in time, and for the purpose of the hypothetical, would say that if it is a final agency action, then it should be channeled to the CSRA because it's explicitly an individual personnel decision that the CSRA contemplates reviewing. Okay, but what I'm trying to get at is that the record before us and the record before the district court was that an executive order was issued, and then the next day, pursuant to that executive order, what is it, 1047-1042, full-time employees were placed on administrative leave, and then other things happened with people under personal service contracts, but let's just keep things simple and let's talk about the full-time employees. So, if you have-tell me why we shouldn't consider that decision to be, at least for discreteness purposes, in finality purposes, in concreteness purposes, a final agency action. So, I think there are a few problems with considering that as a decision in the first place. So, to step back, plaintiffs can point to no directive, memorandum, email, document, any kind of directive, written or oral, to show or to specifically challenge related to employment-employees being placed on leave. So, there's not a document that plaintiffs can point to saying, this is the agency's decision to place everyone on administrative leave, and this is what we're challenging as a final agency action. Now, we would maintain our arguments that even these are all employment-related disputes, and just because there are a lot of them doesn't mean that they are precluded from the CSRA, but even if we were to go down this argument and say arguendo, there was some kind of single decision. I mean, the Thomas Declaration says that because, pursuant to the executive order, the agency placed 1,042 full-time employees on administrative leave with full pay and benefits. Are we saying that because the agency didn't put that on letterhead and say that on March 15th, that's what, that's why it's not final agency action? The APA does require, it gives definition of what agency action is, requires it to be a rule or a sanction or a license or withholding of such actions. And so, it is important that plaintiffs be able to put, point to something that is one of those things to challenge agency action. And here, that is not present, even with the decision, even with these multiple employment-related decisions. There's no, for plaintiffs to lump those all together and then call that a final agency action runs into the problem that National Treasury identified where there were a bunch of discrete actions taken and then plaintiffs lumped them all together and put it under a title and then challenged that. They didn't lump them together. The executive lumped them together. I mean, is there any reason why we shouldn't credit the Thomas Declaration? Crystal Thomas lumped them together. Even though there were a volume of employment-related actions, that doesn't mean that each of them shouldn't be treated individually. The CFRA provides a mechanism to do that. And I think that the record below, as it's played out, also is informative on this point, that the people's employment statuses are not what they were in March. There have been a variety of changes and fluxes since then. And so to treat everyone in a lump sum rather than to treat employment decisions as individual and as they should be channeled under the CFRA would not only in round-to-round the CFRA, but impermissibly lump all these together and put a title on it, which is exactly what Lujan warned that should not be done under the APA. Is there any dispute about what happened? I mean, this one piece of the case seems to me a little bit different from NTEU. In NTEU, the shutdown decision was inferred and built up from a bunch of different kinds of agency action, and it was vehemently denied by the agency. And it seemed like the agency's position was shifting over time. I mean, just on the question whether a bunch of employees were placed on administrative leave right after the EO, we think that's a pretty specific question for which there's a pretty clear answer. I think that that doesn't take it out of the fact that it is an inherently employment-related question. I agree with that. But I think you were fighting, Judge Wilkins, on the final agency action, you know, the second half of NTEU rather than the first half. And that was a little surprising to me. So the agency status right now since the entering of the injunction on April 22nd has obviously changed a lot. Prong 3 of the injunction ordered the agency to restore broadcasting, Voice of America broadcasting consistent with the statute. And so the agency is currently broadcasting consistent with the statute and obviously has changed its personnel decisions consistent with that. Similar to NTEU, the agency acknowledges that it does not have unilateral power without an act of Congress to dismantle itself. And that's also why plaintiffs claim that there has been an alleged policy of dismantling does not hold up. Not only is there not a formal memorandum or decision or directive that they can point to saying that there's such an alleged policy, but that's inconsistent with the executive order, which orders that the agency's actions be taken down to the statutory minimum and also inconsistent with what the agency is currently doing today in terms of personnel and also in terms of broadcasting. And I think that's also a point for why programmatic challenges are improper under the APA. And Sue is reasoning for why judicial management of an agency and all of its particulars would be problematic, because it would lead to overbroad judicial management, which is not only not administrable, but also puts the judicial branch in a position of trying to manage a lot of complex policy decisions that the agency is better suited to manage. Are you asking us to say the preliminary injunction based on changed facts since the time that it was entered? It seems like that's an argument you take to district, not to us. So we can't assess what facts have changed or not. We don't find facts. We review factual findings. Your Honor, we would submit that the court could decide this case on the record that it has before us. We're not asking this court to find additional facts based on the fact that there's no final agency action for this court to review, and then based on the fact that an employment-related remedy is not proper under an APA claim. And that's the general heart of this case and what happened here. The APA allows a district court to order an agency to do something, but it doesn't then permit the court to go one step further and order the agency how to do it. And in particular here, with what employees to do it with, whether a number or by name, i.e., the specific group of employees who was working prior to March 14th. All right. We'll give you a couple of minutes in reply. Thank you, Your Honor. Ms. Yeomans. Good morning, Your Honors. Georgina Yeomans for the Whittaker-Swara Plaintiffs. I'd like to say a few things about final agency action and then discuss channeling. On the question of whether the blanket placement of employees on administrative leave is a final agency action and whether that's an appropriate thing to    find on this record, I will point out that that is what Judge Lamberth held in his memorandum opinion at pages 24 to 25. He identified several different actions that he thought were final agency actions, one of which was the blanket placement of employees on administrative leave. And in terms of a statement, to the extent the court believes that an agency statement announcing its decision is required to constitute final agency action, we have not only the Thomas Declaration that Judge Wilkins identified, but we also have a press release on agency letterhead issued on March 15th, which is at JA88 of the record, in which USAGM said discusses implementing the executive order and says, most USAGM staff affected by this action will be placed on paid administrative leave beginning Saturday, March 15th. So we do actually have an agency statement to that effect. In terms of channeling, Judge Katsas, I'd like to begin with your question about third parties and whether their claims should be channeled to administrative agencies. And you're exactly right to pick up on the Reporters Without Borders and the New Skilled Plaintiffs, both of which the records show have members who live and or report in countries that are affected by authoritarianism and don't have access to a free press. And for that reason, they rely on USAGM reporting to inform their personal safety. And in the Reporters Without Borders context as an organization, they rely on these outlets to disseminate their own reporting and the work that they do. Just help me drill down a little on those two, what the theory of injury and standing are. Am I right for Reporters Without Borders, it's effectively a listener standing? It is effectively a listener standing injury. It's not something that has been contested, their standing or the New Skilled on this basis. But yes, there's a very detailed declaration in the record from the Reporters Without Borders representative, which is at JA124. And she details extensively that they have members who live and report in Afghanistan, Armenia, Azerbaijan, Bangladesh, Cambodia, Colombia, the Democratic Republic of Congo. I can go on and on, but there are about a dozen countries where the Reporters Without Borders is the only source of independent news to, for instance, inform them when there's going to be a crackdown on free press and they might be in danger of being put in prison. So that is their harm. And then as an organization, RSF also has the dissemination of their work, as I mentioned earlier. I hadn't thought of this point, honestly, until this morning. So just help me run it to ground a little bit. I get the, if you think of it as listener standing, I understand everything you just said. Another possible analogy is informational standing, the concept we use in our FOIA cases, where we say you need to claim an entitlement to the information that you're seeking. And it seems like a little bit of a stretch to say, I mean, there's a duty on the agency to broadcast. It seems like a little bit of a stretch to say that any one listener has an entitlement to any one program. It may be a problem if it's an informational standing case, but I don't recall that our listener standing cases impose that requirement. So how do I think of that issue? The theory is not that there's an entitlement to any one program. The theory is really an APA theory, that there was a cessation of programming on which these plaintiffs relied without the kind of reasoned decision-making that's required before an agency engages in such a dramatic change in course. Put aside the reasoned decision. It's the injury. It's loss of the programming. So one day on March 14th, there was a regular reliable programming. The next day it went silent and these people are harmed as listeners because of that loss of programming. And how about the last? The last plaintiff, as I understand it, is a union representing employees of the grantee. So why did they, I mean, they seem like they're in a way less removed than the unions representing the employees of the agency. Like either they're no better off than those unions or they're lumped up in the grants issue, which we think are moot. Do they have any theory for standing that above and beyond what Reporters Without Borders has? Sorry, not above and beyond. They just raised the same. But it's not on behalf of their members who work at Radio Free Asia. The News Guild is a union of 27,000 reporters, including people who work for the Wall Street Journal and the APA and various international outlets. Is it just the same listeners? This is on behalf of people who, exactly, who report in these countries as well.  And this court has never held that such parties are channeled to administrative agencies merely because the relief that they're asking for would implicate federal. They would have standing as listeners. I agree with that. Absolutely. Okay, great. And I think that's what the NCEU opinion. That's what I'm trying to tell you. Yes. Yes. That is the theory of standing. I mean, in FCC terms, it's like listener standing. In NCEU terms, it's like the NAACP, which is consuming services that the agency, the allegedly shuttered agency, is providing. Absolutely. That's exactly it. They consume the services that this allegedly shuttered agency is providing. And the court held that as a matter of 706.1 as well, like the failure to provide international broadcasting. Okay, thanks. So I think, if Your Honor is satisfied, that those parties would not be channeled for that reason, I'll talk about our other channeling argument, which is that even the employees who are placed on administrative leave should not be channeled because of the unilateral removal of certain members of each administrative agency created by the CSRA. That's a tougher one for you. I disagree. Go ahead. So this is an argument that we have made at every stage of this litigation, and that's reflected in the response that we filed on Friday to the 28J letter. I just want to make sure that's clear. But that the Fourth Circuit recently adopted in June, in an opinion called Owen, and the argument goes that Thunder Basin is a doctrine of jurisdiction stripping by implication. So is it a plausible and fair inference from a comprehensive statutory scheme that Congress intended these disputes to be channeled to administrative agencies? And one of the fundamental premises of the CSRA is that the administrative agencies adjudicating these disputes will be independent from the President. So I'd just like to quote from the third line of the Senate report that we cite in our brief. It's 95-969. It provides for an independent Merit Systems Protection Board and special counsel to adjudicate employee appeals and protect the merit system. That same report is replete with references to the independence of these boards specifically from the President, and includes discussion of the FLRA as well throughout the report. And with the President's removal of those agency heads without cause, they are no longer insulated by removal protections, and therefore no longer enjoy that independence that was a fundamental aspect of the CSRA when it was passed. So for that reason, we think that this is a Thunder Basin Step 1 argument, and NTU obviously didn't engage in that sort of logical antecedent question of whether Thunder Basin Step 1 is still a fair inference in the world that we're living in. And I will say that the removal of each of those individuals happened before the actions at issue in this case. So at the time that these employees were placed on administrative leave, the individuals had been removed, and the remaining members of those adjudicatory boards were on notice that they could be removed for any reason, including reaching a decision that the executive disagrees with. Does that convince you? Do you have any other argument with respect to channeling beyond the theory you just articulated supported by the Fourth Circuit case? Beyond that and beyond the third parties, which we think supports the entire relief in this case, including Prong 1 of the injunction, because it was necessary to vacate the agency actions that caused this harm. We also think that this case is distinguishable from NTU on Step 2. I recognize that's a harder argument to make now with NTU, but because this is not a collection of individual personnel actions and because there is an indisputed policy in place under which each of these actions took place to close the agency, we're challenging a sweeping undifferentiated personnel action in the service of an agency ceasing its mandatory statutory functions, which we think distinguishes it from NTU. Those are the three reasons we think that there is jurisdiction. So just so I'm clear, you're saying that that's an argument that this is collateral? Exactly. The CSRA. Yes. And I think the Owen argument can also go to the availability of meaningful judicial review, or excuse me, meaningful review, because if you look at Elgin, engaging in that analysis and in sort of cabining the Webster versus Doe presumption of review over constitutional questions, relies on fender basin and a part of that opinion that stresses the independence of the mine act and the commission review as sort of alleviating the concerns of channeling constitutional questions. But I think both the collateral prong and the meaningful judicial review are meaningfully different given the arguments that we've made in this case. I would think that you would rely also on action because action points out that effectiveness of the review is something that should be taken into account. Absolutely. Axon is one of our primary cases. And I also think that when we're in this land of non-independence of the  there's the general reliance on judicial review as a backstop is less secure as we've seen in cases like dark to see where if you don't have independence at the agency level and you have deferential review on judicial review, there's not necessarily the protections in place that are necessary to ensure a fair record and a fair full and fair review. So I'm trying to understand the CSRA scheme. Placement of an employee on administrative leave with pay would be the type of action that's akin to a termination, et cetera, under I think it's 7512. That could be appealable to the MSRB or MSPB mixing up all these acronyms here. But under cases from our court like Calducci and others that have said that, well, it could be a prohibited personnel practice because placement on leave even with pay is a personnel practice. And it could be a prohibited personnel practice if it's done for one of the bad reasons. And one of the bad reasons is if it's an action that's done arbitrarily. And that's deemed to have a broad meaning. So if that's the case, then I would suppose that your friends on the other side would say that as a prohibited personnel practice, your client's remedy is to go to the special counsel and ask for that action. And then if the special counsel finds that it was arbitrary and therefore prohibited personnel practice because it didn't comply with the statutory mandate, special counsel would ask the MSPB to stay the action and could do so on a class-wide basis or a collective action basis. So for all 1,042 employees, and there's your remedy. I think that also runs into the Owen argument, though, because it does depend on the special counsel being willing to take that allegation to the MSPB. And the special counsel is one of the individuals who is removed without cause. So whether or not these employees can count on getting a fair process before the special counsel I think is an open question. Isn't there an acting special counsel? There is. But I think the broader point is that that person knows that they can be removed at any time. So their decision-making is not divorced from accountability to the executive whose very actions that person is charged with adjudicating fairly to ensure fairness to federal employees. Well, people do the right thing even if there might be consequences like firing. There are people of character and courage out there. The acting special counsel could say this was arbitrary. I'm resuscitating all these people. Let the chips fall where they may. So you've got a remedy. I think that is true that people do the right thing all the time. But I think the question, at least to the Owen argument, is whether Congress wanted to sort of depend on people doing the right thing on a case-by-case basis and sending all these issues to an executive who insulates the decision to do the right thing. And I understand that this is an uphill battle, in part because there are a lot of claims brought before the MSPB. But I don't think that finding for us on this argument would require saying that every single claim under the CSRA can come to district court as an initial matter. I think the question is whether there's still an implication of jurisdiction stripping of claims that exist independently of the CSRA, like APA claims and like constitutional claims. Sorry, what's the line you're drawing there? Couldn't any allegedly unlawful employment action be cast as one that is arbitrary in APA terms? Possibly, but it might not be meritorious, right? Those wouldn't be... What would distinguish the good district court actions from the valid ones from the invalid ones? Motion is to dismiss. Being able to dispose of those quickly and having a cause, I guess... But substantively, what... No, I mean, I think that there's not a time to distinguish them substantively. That's right. But I think that the remedies that Congress created in the MSPB, or sorry, whether the cause of actions that Congress created through the CSRA, it would have intended to still be enforceable in district court, is the question. That's sort of what I'm trying to get at. I'd also, if I may, like to briefly address the point that the injunction was over... Sorry, just let me try once more. Are you saying that in light of the for-cause... Sorry, not-for-cause removal of MSPB and the special counsel and MSPB members and FLRA members now, any employment, any challenge to an adverse employment action by a federal employee can go to district court because the CSRA scheme is just broken? The argument we're making is that the implication of channeling cannot survive the lack of independence. And so I think it's... That's a yes. I think that's plausibly a yes. And I think that the concern is heightened in cases like this, where there's an allegation of executive overreach and executive unlawful action. But that is, I think, a potential implication of the argument I'm making, yes. And then I'd also like to just briefly address the argument that Part 3 is overbroad to remediate third-party harms because Your Honor was interested in the third parties. And because Ms. Stout talked about the sort of status of programming today, I'll just state that in the absence of Problem 1 of the injunction, programming has not resumed to the majority of the parties identified in the Bruton Declaration, so has not remediated that irreparable harm that was brought before the district court. And we think it was an appropriate exercise of Judge Lambert's discretion to see that each part of the injunction was necessary to both walk back the unlawful agency action and preserve the status quo pending the end of litigation, which is an appropriate use of a preliminary injunction. Just one quick question on the scope of the injunction if we get there. It clearly requires restoration to pre-EO employment levels. And then he, in the stay order, he clearly permits terminations for cause. Yes. Do you read his order as prohibiting a RIF? I read his order as... In other words, it's not an issue of employee misconduct. And let's assume we're not talking about 90%. It's just kind of the ordinary downsizing one would expect in a change of administrations and the agency wants to lay off 10% by RIF. Can they do that as of right now? I read his order as prohibiting that type of... Sorry, permitting that type of action on the premise that there was compliance with the APA in terms of a reasoned decision-making, thinking through who was necessary in order to fulfill the agency's obligations. And obviously, a RIF will change the amount of programming. So thinking through ahead and considering stakeholders and a reasoned decision-making on that change in programming. So I think I view it as prohibiting, like, the exact same RIF, right, without... This is very much like the problem that the NTEU panel faced on the stay litigation where we just had the scope of the injunction before us and 90% might raise an eyebrow, but no RIF raises a pretty big eyebrow, too. Well, that's why we're not saying no RIF. I think that there has to be agency reasoned decision-making whenever they take something that is of a dramatic level that will change the services that's provided. I think it's sort of inherent in the hypothetical, which I take to mean, you know, a wide-scale RIF, right? Maybe a RIF of 20 people would not rise to that level of disruption of programming, but if you're going to fire half the agency, that's probably going to result in programming of fewer than 49 language services. So I think that you would have to take the initial step of thinking through that decision before effectuating a RIF. But I do think that the scope of the remedy also counseled in favor of Judge Lambert's injunction, which was, I think, the least intrusive in terms of he didn't try to decide how many employees the agency would need to fulfill its statutory mandate, which is the problem that... It's an awful catch-22. We tried it in NTEU on the stay. It didn't work out too well. It would be totally arbitrary for a judge to pick a number.  And in particular... If the judge doesn't pick a number, you just, you know, then we have compliance disputes. Right. And particularly in the face of the agency's admission that this is a blanket placement on administrative leave, there would have been no basis to do that. But I think in the context of a preliminary injunction, right, this isn't purporting to tie the hands of the government, even on this limited basis, for longer than it takes to resolve the litigation. So I think it's an appropriate means of restoring the status quo. Thank you very much. Just to follow up on that. If the government, instead of appealing the preliminary injunction, had reinstated everyone to full-time work, and then the next day issued an order saying that we believe that we can have statutory duties with 90% of the workforce, and so for that reason, you know, after our, you know, consideration, we are placing, you know, 10% one leave. That wouldn't have been prohibited by this injunction, would it? I don't think so. And I think if there were concerns about the process that the agency came through, which the agency came to the decision that it could do its duties with 90%, that would be a separate challenge. Yeah, but that's just, I mean, if it's not precluded by channeling, that's just an argument that that particular decision was arbitrary and capricious because it wasn't well-reasoned. But that's separate and apart from whether this injunction would have prohibited that. Absolutely. And our argument is not that the agency can never change course, can never make the decision to shrink the agency. Our argument is it has to do so in a reasoned way that complies with the law. And I don't think this injunction prohibits that. It merely tries to walk back what the district court was found was likely in many ways an agency action that it had taken. All right. Thank you. Thank you very much. Mr. Schultz. Thank you. Bill Schultz for the Brownwoods plaintiffs and appellees. I want to say a word about jurisdiction, one issue that's particular to Mr. Abramowitz, and then I want to spend the bulk of the time on final agency action. Our position is that Mr. Abramowitz's claim under Thunder Basin is not of the type that Congress intended to go to the Merit System Protection Board. Abramowitz brought this case, as the court knows, to enjoin the closure of Voice of America because the defendant's actions had prevented him from carrying out duties entrusted to him by Congress. So the case is not about his status as employee, but about the agency being shut down so he could no longer direct it. If everyone else had been put on administrative leave and he had not been, he'd have the same case because it's about the agency being shut down and not about him. And so when you take it in that context, under the three Thunder Basin factors that are to be considered, we think it demonstrates that the case is not channeled under the CSRA. Now, I'd like to address... Can I just ask a factual question there? Yes. I thought I remember reading somewhere that there were, I think, 39 broadcast engineers, total two had announced retirement, and the other 37 had been placed on leave. So just kind of like as a physical matter, there wouldn't have been anybody to perform the function of broadcasting. Do I have that correct? I don't know if those numbers are correct, but I can tell you that the district court found, and I think the defendants have admitted, there was no broadcasting beginning on March 15th, none at all. And that was true on April 22nd when the district court entered its preliminary injunction. On the final agency action, the sequence of three events is critical. On March 15th, nearly all USAGM employees, including 1,300 from Voice of America, were placed on administrative leave until further notice. They were paid, but not allowed to come into work, and not permitted to work. That's March 15th. The next day on March 16th, the defendants notified approximately 500 personal service contractors that they would be terminated two weeks later. And one day after that, on March 17th, the director of stations and operations instructed all USAGM foreign service employees to shut down all transmitters, and within two days to place nearly all local employees in administrative leave. Each of these actions was discreet. And each of them is separately reviewable. And they were identified as that way by the district court. On page 24 and 25 of his opinion, he talks about actions that are reviewable, and he lists each of these. With respect to the action to cease transmit, let's suppose that that's a discreet action, but how do we know that that's fine? Well, we don't review, you know, every, you know, tentative action that an agency takes.  Well, it's, I mean, it's final until it's not. And I think it is a discreet action that's reviewable. Of course, an agency can always change, but that doesn't make the action less final when you close down all the transmitters and send everybody on administrative leave, you know, in a single day. The district court we think correctly found that that's a final action, but it may not be critical to the injunction because the injunction really went to the preliminary injunction. And as you pointed out, Judge Wilkins, that's critical. This is a preliminary injunction to hold things in place to preserve the status quo until the court can decide the merits of the case. So it's not about the merits or anything else. It's what was deemed necessary to hold things in place. But I think in addition to that, the March 15th decision or action to close Voice of America is also reviewable. As a district court found as a result of defendant's actions, VOA is not reporting the news for the first time in its 80 year existence. This is on March 5th. Its website has not been updated since March 15th and radio stations abroad that rely on VOA programming have either gone dark or air only music. The court found on page 22, it's not credible to argue the agency is still standing as of the time of its preliminary injunction more than a month later. These facts have never been disputed by the defendants. The defendants have also never disputed that their actions were arbitrary and capricious or in violation of law. And I want to contrast this to NTU. There, as Judge Katz has pointed out, the record showed that the agency was functioning on some level at the time of the preliminary injunction. Here, it was closed. There was no broadcasting. And as, as my colleague pointed out on March 15th, Carrie Lake, one of the defendants announced on a website, and it's in the record that most employees would be on administrative leave and that the agency was not salvage, salvageable. Now the defendants have argued that there's no written document here and that it can't be an action without a written document. And I'd like to make two points in response to that. First of all, as the district court found that this decision was reviewable under paragraph one of section 706 of the Administrative Procedure Act as an agency action unlawfully withheld. And if that's correct, no written document would be required. What the district court said was defendants have unlawfully withheld international broadcast programming while the VOA remained indefinitely silent. But also the action is reviewable, we think under paragraph two, even if there's not an actual written decision. Although I would point to the press release on March 15th as written. And there's three cases in this circuit that hold that. The first is Hispanic Affairs Project. It's cited in our brief. And there the Homeland Security Administration had an unwritten practice of extending the visas of hers for up to three years, even though its regulation said the maximum was 364 days. The policy was not written down, but the court said it was identified as a policy. It was happening and it was an agency action that could be reviewed. And it pointed out that Lujan had acknowledged that applying a particular measure like this across the board is reviewable under the APA. The other two cases are discussed in NTU, but the Venetian Casino Resort case there, the EEOC had an unwritten policy disclosing confidentiality. I remember those. We did not have Hispanic Affairs. It's not up to us. So I'll take a look. Yeah. And it's in our brief. Part of NTU said in order, put aside the action unlawfully withheld for a minute in order to be reviewable as agency action under 7062 has to be a rule. Rule requires a statement. It doesn't necessarily have to be written, but there's some indicia of concreteness and formality and the like. Do you disagree with any of that? As long as it, I don't think it has to be written, but I certainly agree that it has to be a concrete action, but I think we have that here. The three actions that I started with, I think are very concrete. The decision to send almost employ all the employees home on administrative leave. It's a concrete action. And as I said, there's actually something in writing about that in the press release. Sorry, give me the other two. Just refresh. The decision to fire all the service notices. Not in the, not as a risk. On March 16th, they announced that they were going to fire all personal service contractors. Of the PSCs. Yeah. That's the second. I got that. And the third one was a decision to close all the transmission stations. So we would argue those are very discreet and, and, and, and are reviewable. And as I said, the Venetian blinds and I won't go through it, but the brotherhood locomotive cases also mentioned in NTU and there, there wasn't a written decision there either. Just, just to clarify, how is an announcement that you intend to fire some people, the final agency act? Well, it basically said, we're going to send you a notice that you're fired and effective in two weeks. So it's not that they intended to do it. It's like you're fired. We have to give you two weeks notice, but you're, you're, you're out in two weeks. So I think it was a decision to actually fire them. And I think those are the notices they got. The government relies very heavily on Lujan and Norton. And I want to just address each of those briefly, as I know the court knows, Lujan is a challenge to the Bureau of land management's land withdrawal program. And so it was a program, you know, where periodically the Bureau of land management would withdraw a piece of property from public lands and, and, and make it available for private sale. And the plaintiff there said, essentially, we don't like how you're running this program. We think there's some things in it illegal. And, and the court said, well, you can challenge a particular action, but you can't challenge the whole program. And I would just submit that what we have here is very different to the reasons that I've explained that we have specific actions being challenged in Norton. The court also said there's no agency action to review, but, but what happened there is the plaintiffs didn't like the way the Bureau of land management was running the wilderness areas. And it said, you, we think you should ban all terrain vehicles. And the court said, well, you're not complaining about an action. You're complaining actually about inaction. And you can't do that under the, under the administrative procedure act, you know, particularly with, you know, if there's no legal basis for it here, again, the agency took the discrete actions that I've already outlined outlined. Now the government argues. Suppose you were right, Mr. Schultz, that there is a discrete agency action at issue to shutter the agency. And it's distinct from anything employment related, which will get channeled.  That gets you paragraph three of the preliminary injunction. Why does it get you paragraph one, which is entirely about employment decisions? I think the reason is the basic argument here, which is that what the agency was doing was arbitrary and capricious. And it was also done with without done without any reason explanation as required in state farm and, and, and all the cases. That's your, that's your merits. That's our merits argument, but the preliminary injunction is to preserve things for the merits. So that's the merits argument. And that, that includes possibly figuring out what's legally required, but it also could include if, if you close, if you decide to basically close down the agency and send everybody on home, you know, despite the appropriations and so on, it may be much broader than that. So there are legal issues the court that had to be litigated in front of the court. And it was, in our view, appropriate to preserve the status quo by saying these people, you're going to continue to operate. Well, we decide whether your legal issues are, are viable and exactly how far we're going to go. The government one other point is the government argues that the district court is micromanaging the agency. And I just want to say there's nothing in the record to support that. The P the preliminary injunction didn't tell the agency how to use its employees or, or, or anything else. It simply set things back to the way they were before March 15. It is Judge Wilkins points out the plan, you know, get the facts as of the time of the preliminary injunction. And it's about the status quo and not relief in this case. I have a nice conclusion, but I think you'll know what it is. If there are no further questions, I think the court first time. All right. Give her five minutes. Thank you. Okay. So I heard my friends on the other side talk a lot about loss of programming and loss of broadcasting. And that being the crux and the thrust of their heart. And I think that that is illustrative of the mismatch between the injunction, the prong of the injunction that we're challenging here and the three prong injunction that the court actually entered. So I heard my friend on the other side, talk about the harm to reporters without quarters and the new scale being the loss of programming. And I heard my friend on behalf of Mr. Abramowitz say that his status as an employee, or this case is not about his status as an employee, but about the agency being shut down. All of that relates to this, their claim about alleged dismantling the agency and complaints about programming may get you an injunction closer to prong three, but it doesn't extend and get you to an injunction that was entered in prong one. So if a plaintiff comes in withstanding, it says a particular agency action about programming or loss of certain services is harming them. Then we don't dispute that they could have a cognizable claim under the APA. Our primary contention on appeal is that the district court, when that went that extra step further and ordered the agency, how to conduct its operations by ordering the restoration of particular employees and contractors. How does that argument work? When you need engineers and other people like that to physically perform broadcasting, which is a statutory mandate, and you place all of those people who perform that on leave. It's not our contention that an injunction to that would require an agency to, for example, resume particular broadcast services would mean that the agency would be permitted to have no employees to do that inherently in the nature of, in order to broadcast certain services or an injunction requiring the broadcast of certain services, the agency presumably would have to have certain employees work in order to fulfill that portion of the injunction. But that's the main point here that is up to the agency's discretion to perform the services and to perform compliance with the injunction. So if the district court had said restore to their status all engineers, would that have been a permissible prong of the injunction? We would say that it would not be a permissible prong because again, it goes back to the employment decisions, which are in the inherent discretion of the agency. If the injunction or if the court entered an injunction that required the resumption of certain broadcast services that would necessarily require the agency to have certain technicians or transmitting stations to resume those services, then that would be up to the agency to, to employ those services, to be able to comply with that portion of the injunction. And if a court entered an order saying resumption... If it's undisputed that you can't broadcast without engineers, how is it within some sort of specialized expertise or discretion of the agency to say rehire the engineers? So we would say that it's a matter of district court, the district court's ability to order certain relief under the APA. Our position is that under the APA, because of the CSRA, which provides reinstatement as a remedy, it precludes the court from being able to order reinstatement as a remedy under the APA. So the court could enter an order saying perform a specific service if that specific service is statutorily required. And if the agency needs an engineer to be able to resume that service, then that's up to the agency to bring back that engineer. I'm trying to understand your argument. So let's suppose that what happened here is that the agency had said, based on the March 15th executive order, I am shutting down the agency and everyone is placed on leave. Every single employee is placed on leave. Effective immediately. Are you saying that the district court is not ordering the agency to essentially set aside that action and reinstate everyone? It could only do the equivalent of a prong three and say, you are ordered to comply with your statutory mandate. Is that your argument? You could only do prong three? Our argument is very similar to that with a few caveats that I want to provide. So first, our submission here is that this case is not like in your district, in your honor. Just answer the hypothetical. So if the agency issued an order that this court construed as a final agency action that said the agency is shutting down effective immediately and we're laying off all employees and the agency construed that as a final agency action and said that was arbitrary and capricious, then the agency or the court could enter some kind of order saying, setting aside that action. But I think that's the key point. The court could set aside that action. Setting aside the action of placing all of them on leave. So that the court could do that. So the court could set aside the agency's decision to shut down and depending on what's in that order, that would have implications for the practical working out. But to the extent that ordering specific reinstatement of certain employees our position is that the APA would preclude that because that is an inherently employment-related remedy and the CSRA provides the exclusive scheme and provides reinstatement as a remedy there. So as a practical matter, a district court's order setting aside an agency action to shut the agency down would as a practical matter result in the agency bringing back employees. But our position is that the APA itself does not, because of the CSRA and its preclusive and exclusive scheme that has reinstatement as a remedy, under the APA the court cannot order specific reinstatement of certain employees. I interrupted you. I think you were making, you were going to make another point. Oh, from my, I don't have anything further at this time, Your Honor. All right. Thank you. Thank you.
judges: Henderson; Wilkins; Katsas